## NATIONAL LABOR RELATIONS BOARD v. SPIEWAK et al.

No. 9875.

United States Court of Appeals
Third Circuit.

Argued March 24, 1949.

Reargued May 16, 1949 and Dec. 1, 1949.

Decided Feb. 2, 1950.

Rehearing Denied March 11, 1950.

Arnold Ordman, Washington, D.C. (David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Marcel Mallet-Prevost, Washington, D.C., on the brief), for petitioner.

Gerald H. Chambers, New York City (Chambers & Chambers, New York City, on the brief), for respondents.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, O'-CONNELL, KALODNER and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order against respondents following proceedings under Section 10 of the. National Labor Relations Act, 49 Stat. 449, U.S.C.A. Title 29, § 160.

Respondents are garment manufacturers. During the period with which we are concerned, they were engaged principally in

making leather sport jackets.[1] Since 1937 respondents' employees have been represented in their collective bargaining by the Golden Fleece Association. In 1941, the Board conducted an election among the employees to determine whether they desired to be represented by the Golden Fleece Association or by the Amalgamated Clothing Workers of America. The Association won the election. In 1942 and 1943, contracts between the Association for the employees and the respondents were entered into. The expiration date of the 1943 contract was April 1, 1944. That contract, in effect, called for a closed-shop. It was so treated by the parties to it, and no contrary contention has been raised in this proceeding. It provided that new employees could be hired from without the Association, but would be required to join it within a four week period. The contract also contained clauses covering weekly dues check-offs, maintenance of membership, and a "no-strike" provision.

In February, 1944, there were negotiations between the Association and the respondents with respect to a new contract. The main question had to do with wage increases. It is conceded that rumors of activity during that period on behalf of Amalgamated were known to the employer, and, with them in mind, respondent Philip Spiewak, in the latter part of February, 1944, asked an employee wage increase committee of the cutters whether they were from the Association or another organization. The answer was that "right now" it was the Association. Shortly thereafter, two foremen, Newfield and Klein, made a "proposition" to a member of the cutters' committee that if the cutters would leave the rest of the factory out of the organization and "not bother the operators" and "forget about the union", Newfield or Klein would "see to it" that the cutters got a ten per cent raise. Following this, Newfield told three other employees that he had asked Spiewak to give the cutters a raise "providing you will not bother with the operators and also not with the union". Around the same time (late in February, 1944) Klein said to Mary Tarantino, an employee active on behalf of Amalgamated, "You know, you are a silly kid. You know Mr. Spiewak will never permit another union in here but the Golden Fleece."

On March 6, Amalgamated called a srike contrary to the plain language of the "no-strike" clause of the 1943 employment contract. Practically all of the employees were out for two days, but, on March 8, a number of them returned to work. On March 13, the organizer for Amalgamated asked Harber, respondents' assistant general manager, " * * * if it was not possible for us to get together with Mr. Spiewak in regard to a contract with the Spiewak company as we had the majority of the workers." Harber stated that he told Spiewak of this and that Spiewak said to him, " * * * whatever is to be done in that direction, he is capable to take care of it himself without any help from me." On March 17, Amalgamated filed a petition for certification as bargaining representative for the employees with the Board. Meanwhile, on March 17, a contract was entered into between the Association and respondents extending for another year the 1943 agreement which was about to expire.

Without attempting to outline it at length, there is substantial evidence in the record that, as the Board found, during the strike respondents tried to induce individual strikers to return to work. Negotiations for the termination of the strike started in the latter part of April, 1944. These continued during May and June, but broke down over the exclusion of six strikers who, the Association insisted, were not to be reemployed "because of the actions by them in assaulting and threatening members of the Golden Fleece with physical violence and in their misleading and unauthorized behavior."

The Board did not hold an election following Amalgamated's claim for representation. Almost two years later, on February 26, 1946, a complaint was issued and thereafter hearings were held. On June 11, 1946, the Trial Examiner's report was filed. The decision and order of the Board was filed November 27, 1946. Petition

1. The parties agree that the Board has jurisdiction.

for enforcement was served on respondents on or about January 1, 1949.

The Board held that "in the period immediately preceding Amalgamated's request for recognition unlawful assistance was given by the respondents to the Association." It held further that such assistance alone "rendered the respondents' subsequent recognition of, and contract with, the Association unlawful", and that "by entering into the closed-shop contract of March 17, 1944, with the Association, respondents interfered with, restrained and coerced their employees, within the meaning of Section 8 (1) of the Act." It also held that "respondents discriminated with respect to hire, tenure of employment and terms and conditions of employment, thereby discouraging membership within the meaning of Section 8 (3) of the Act by their conduct in enforcing their closed-shop and check off of dues provisions of the Association contract on and after March 17, 1944."

With direct reference to the strike, the Board found "that the respondents, by attempting through various supervisors, and by permitting employees to leave work, to induce striking employees to return to work, unlawfully interfered with their employees' concerted activities, within the meaning of Section 8 (1) of the Act." The Board states that " * * * the respondents' efforts to induce individual strikers to return to work, in our opinion, constituted a calculated effort to weaken and discredit the strike called by the Amalgamated, by depriving it of the support of the individuals solicited to abandon the strike." By such solicitation respondents were found to have "interfered with, restrained, and coerced their employees in the exercise of the rights guaranteed in Section 7 of the Act."

The order of the Board calls for the respondents to cease and desist from recognizing or dealing with Golden Fleece Association as the representative of any of their employees; from giving effect to either the 1944 or 1945 contracts with the Association; from discouraging membership in Amalgamated or in any other labor organization of their employees, by discharging or refusing to reinstate, etc.; in any other manner interfering with employees in their right to form labor organizations, in joining or assisting Amalgamated or any other labor organization, in bargaining collectively through representatives of their own choosing or in engaging in concerted activities for the purpose of collective bargaining, etc. The affirmative action ordered consists of withdrawing and withholding recognition of the Association as bargaining agent unless or until so certified; offering forty-three named employees reinstatement and making whole any wage losses to them since April 21, 1944, less net earnings during that period; making whole thirty-five named employees for specified wage losses less net earnings; reimbursing each employee for check-off dues paid by him since March 17, 1944; and the usual posting and notification clauses.

Unless the respondents were protected by their then current labor contract with the Association, the attempts by foremen Newfield and Klein to eliminate Amalgamated and Klein's effort around the same time to discourage the Tarantino girl in her activity for Amalgamated present substantial evidence justifying the Board's finding that the respondents had rendered improper assistance to the Association prior to the wildcat strike. There is a pattern indicated by the named incidents that takes them out of the category of unimportant casual conversation between the individuals concerned, as illustrated by Quaker State Oil Refining Corp. v. N.L.R.B., 3 Cir., 119 F.2d 631, 633, or the type of episodes outlined in N.L.R.B. v. Public Service Co-ordinated Transport et al., 3 Cir., 177 F.2d 119, which obviously had no effect in either preventing or discouraging membership in the there advocated union.

The 1943 closed-shop type of agreement between respondents and the Association was admittedly valid and within the proviso to Section 8 (3) of the act.[2] Under

2. The proviso to Section 8 (3) of the Act reads: "Provided, That nothing in this Act, or in the National Industrial Recovery Act (U.S.C., Supp. VII, title 15,

the interpretation of that contract by both the parties thereto and the parties to this litigation, respondents had to suspend or discharge an employee at the Association's demand where the latter had suspended or expelled the employee from membership, even where such action had been based on the employee's dual unionism. Colgate-Palmolive-Peet Co. v. N.L.R.B., 338 U.S. 355, 70 S.Ct. 166. But the conduct of Newfield and Klein bore no relationship to that type of situation. The demand by the Association that respondents not rehire certain named employees was not made until April 24, 1944. The acts of assistance by Newfield and Klein occurred back in February of that year, and were rendered by the respondents to the Association during the period immediately preceding the execution of the 1944 contract on March 17, 1944. They were intimately tied into the February contract negotiations. During that time there was a valid current agreement between the employers and the Association, but this did not excuse the mentioned assistance which was specially directed at the forthcoming 1944 agreement. That assistance by the employers to the Association was, as found by the Board, unfair labor practice under Section 8 (1) of the Act. It rendered the 1944 contract invalid. Labor Board v. Electric Cleaner Co., 315 U.S. 685, 694, 62 S.Ct. 846, 86 L.Ed. 1120. Cf. Wallace Corp. v. Labor Board, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216.

The Rutland Court doctrine,[3] now repudiated by the Supreme Court in the Colgate-Palmolive-Peet decision, supra, which permitted incumbent union members to campaign for new bargaining representation towards the close of a current contract, obviously would have had no application to the above facts.

■ And it further follows necessarily, we think that the Board's findings must be upheld with respect to respondents being guilty of 8 (1) and 8 (3) violations of the Act by entering into and functioning under the nugatory March 17th agreement. This includes their collection of check-off dues. Such dues must be returned to the employees. This is without prejudice to any right which respondents may have against the Association to the restitution of the dues which they have heretofore checked off from their employees' wages and paid over to it. In connection with this, it must be remembered that the 1943 contract containing a similar check-off provision did not expire until April 1, 1944.

The Board also holds, as to the execution of the 1944 contract, that the respondents thereby resolved "the question concerning representation in favor of the Association, in the face of the representation claim made by the Amalgamated", and, therefore, that the respondents "interfered with, restrained and coerced their employees within the meaning of Section 8 (1) of the Act."

In view of our conclusion that the 1944 contract must be set aside because of improper assistance, the above representation question becomes largely academic, but it should be noted that this finding of the Board is just barely supported by the record. The first evidence of Amalgamated's representation claim was in connection with the strike. It consists of the informal talk the organizer had with Harber on March 13th. That talk was directed to the present adjustment of the strike which had been in progress since March 6th. It is true that the organizer's version of it referred to "a contract with the Spiewak company as we have the majority of the workers", but there was nothing to indicate that Amalgamated was interested in aban-

secs. 701–712), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a

condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made." 49 Stat. 452.

3. Matter of Rutland Court Owners, Inc., 44 N.L.R.B. 587; 46 N.L.R.B. 1040.

doning the pressure of its illegal strike and thereafter proceeding in orderly fashion to become the employees' proper representative under the forthcoming 1944 contract. Amalgamated did file a petition for certification on March 17th. Respondents were not served in that matter until March 24th. There is no evidence that they had knowledge of it prior to that date, though undoubtedly, they were motivated by the strike in speeding the execution of the 1944 agreement.

█ With respect to the incidents arising out of the strike, we do not think that the Board's penalization of the respondents can be fairly justified. The first request for reinstatement of any of the strikers was not until April 21, 1944. Philip Spiewak, respondents' managing partner, testified that he wanted all employees to return, no exceptions, but that the Association objected in writing to the reinstatement of six of the strikers. He said that he construed the Association letter to mean that "if these people who had caused the violence would come back it would cause a disruption in the plant and that they definitely prohibited me from taking them back." The letter specifically objected to the rehiring of the six "because of the actions by them in assaulting and threatening members of the Golden Fleece Association with physical violence and in their misleading and unauthorized behavior." Spiewak testified that he understood "misleading and unauthorized behavior" to mean that "they were referring to certain particular incidents that occurred where there was some physical violence used, and there was also a record of it in the courts and as a result of that, they felt that any people that had anything to do with this violence to be in there would cause more violence." On cross examination by the Board's attorney, Spiewak was asked, "Your refusal to reinstate the six people was not based upon any of the provisions of the contract; is that right?"

Spiewak, answering the question said, "It was based on the provisions of the contract also on the fact that these people would cause violence in the plant if we took them on."

Though respondents had the contract right to discharge employees participating in the illegal strike,[4] Spiewak's subsequent testimony points out that in his above answer he was not referring to such right but to the closed-shop provision of the 1944 agreement. He had no excuse for relying on that invalid agreement in whole or in part, and, if that had been his sole reason for declining to reemploy the six, respondents would have been guilty of unfair labor practice. But he did have another reason for refusal which we think was proper. According to the record, as far as the employers' personal wishes were concerned, all of the employees could have returned. Spiewak testified that he pleaded with his employees to please let the six come back. It was the employees themselves who would not go along with that suggestion. While the letter demanding that respondents not rehire the six did come from the Association, Spiewak definitely identified it as the action of the majority of respondents' employees. The reason for the employees' ultimatum, as Spiewak understood it, was that they anticipated a repetition of the strike violence which they attributed to the six if the latter were taken back. Therefore, the employer in refusing to rehire the six was merely bowing to the damand of, what he termed, the majority of his employees. It is this which distinguishes the instant situation from the Stackpole and Republic cases[5] where the employer was denied the right to withhold reinstatement of employees who had participated in minor acts of violence in furtherance of a strike.

Spiewak's interpretation of his employees' attitude is strongly supported by the testimony of Margaret Berry, the Association

4   N.L.R.B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; N.L. R.B. v. Fansteel Corp., 306 U.S. 240, 249, 59 S.Ct. 490, 83 L.Ed. 627; Matter of Scullin Steel Co., 65 N.L.R.B. 1294;

Matter of Joseph Dyson & Sons, 72 N.L.R.B. 445.
5.   N.L.R.B. v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167; Republic Steel Corporation v. N.L.R.B., 3 Cir., 107 F.2d 472.

president at the time. She said that the employees refused to work with the six "because they had participated in a fight * * *." She denied that there was any discussion at the Association meeting in connection with returning to work regarding the six not being allowed reemployment because they had gone on a strike and joined Amalgamated.

The Board Examiner found that there was no conclusive evidence of violence, but there is some basis in the record for such charge by the employees against the six. For example, a witness stated that Nina Wegg, one of the six, hit Louise Manfredi "in the eye and she couldn't even see * * *." The witness further said "two other girls were hit at that time." Mrs. Berry testified that Maria Pristera and Mildred Arzinger, two of the six, were tied into the Wegg incident. She also connected Mary Tarantino with a violence episode. The Tarantino girl admitted being present, but said she was not involved. Two girls testified that Abe Lerner, of the six group, went to the home of one of them, both being present, and told them if they went back to work something would happen to them. There is testimony by Paul Arnone, one of the six, denying that he had appeared in the police court as a defendant charged with assault and battery during the strike. There is no direct evidence of violence committed by him.

Accepting the Examiner's finding that the evidence of violence was inconclusive, what the above evidence does reveal can hardly be considered as a legitimate concerted activity within the protection of the Act. Whatever it amounted to, it had so antagonized those employees, otherwise willing to work, that they were unwilling to continue if the six were rehired. Even if the employees' accusations of violence were not well founded as to Arnone and Miss Tarantino or as to the entire six, and even if the employees' refusal to continue with the six was based in part upon the latter's union activity (the testimony of Mrs. Berry, above mentioned, indicates that it was not) there is no reason to doubt that respondents declined to rehire the six because the other employees would not work with them, and not from a discriminatory motive.

The fact that the notification of the employees' position came through the Association, is of no real consequence. But it is important that the employees' ultimatum did reach respondents with the latter, according to Spiewak, "forced to abide by their decision and not take them [the six] in * * *."

Under the circumstances we cannot uphold the Board's view that the respondents were guilty of unfair labor practice in not reinstating the six leaders. It is a reasonable inference that unless respondents had yielded to the employee pressure as they did, they would have been compelled to shut down their plant. The Act should not be construed as calling for that sort of result in the light of the particular facts of this phase of the matter.

N.L.R.B. v. Wytheville Knitting Mills, 3 Cir., 175 F:2d 238, 240, presented a somewhat similar situation, though in that case there was no violence involved. Certain strikers had addressed vile language to non-strikers crossing their picket line. By reason of this, the balance of the employees refused to work with those strikers. We held that the employer had not committed an unfair labor practice in refusing to restore those strikers to their jobs. Judge Maris, speaking for the Court, said: "When as a result of it each of them became persona non grata to their fellow workers to such an extent that the latter absolutely declined to work with them and threatened to walk out if they were permitted to remain at work the respondent was not required by the Act to reinstate them at the risk of throwing the seaming department into confusion. National Labor Relations Bd. v. Edinburg Citrus Ass'n, 5 Cir., 1945, 147 F.2d 353. In such circumstances these employees themselves have the duty to make their peace with their fellow employees if they desire to rejoin the working group. We conclude that the respondent was not guilty of an unfair labor practice in failing to permit Cox and Fowlkes to return to their work in the seaming department in opposition to the desires of the employees

of that department and at the risk of its complete disorganization."

In the Edinburg Citrus Association case, cited with approval in the above quotation from Wytheville, two employees were discharged on petition of their fellow employees who accused them of creating "such a state of disturbance and unpleasantnesss" that they refused to work with them. The Court, reversing the Labor Board's finding that the employer had committed an 8 (3) violation, said 147 F.2d at page 355: "The professed object of the National Labor Relations Act is to prevent interruptions of work in plants to the detriment of commerce. That is the ground on which Congress undertook to legislate. We do not think this plant had to be shut down, or should again be thrown into confusion, because two employees are unacceptable as coworkers to the others, whether the ground of it be just or unjust, or in part because of a union disagreement. There was here no employer discrimination within the meaning of the Act."

In connection with respondents' rejection of the six strikers, it should be mentioned that respondents' attorneys, in their letter to the Board of June 20, 1944, and in their argument on this appeal, ascribe the rejection to the closed-shop provision of the 1944 agreement which latter, of course, is asserted to be valid. In failing to mention Spiewak's uncontradicted testimony concerning what, we consider, was his valid reason for not reinstating the particular strikers, concededly they do not add to the over-all clarity of this litigation but, at least, the value of the above discussed evidence is not destroyed.

Objection of the strikers to becoming members of the Association and to check-off of dues had been raised in the course of the negotiations for their return. Those objections were eliminated by Amalgamated's letter to respondents of June 13, 1944. So that the only condition finally insisted on by the strikers was that all be reemployed. Unquestionably, the strikers, with the exception of the six, were entitled to return and the respondents should be ordered to reinstate them.[6] Spiewak's testimony shows that the exclusion of the six was in accord with the Act. It follows that respondents properly insisted that the strikers resume work without the six and that the strikers are not entitled to have respondents make them whole for any pay losses arising from their refusal to return for such reason. In passing, it is not denied that some of the strikers did come back to work. The letter of respondents' attorneys above referred to, in evidence as an exhibit of the Board, states: "As a matter of fact, most of the dissident employees have come back to work and apparently at present are happily and busily engaged by the employer." Others of the employees had meanwhile found jobs elsewhere.

Respondents' two reasons for refusing to rehire the six were affirmatively before the Board in Spiewak's testimony. In the face of that evidence the Trial Examiner concluded that respondents' action was entirely based on one of the two reasons, namely, the 1944 contract. His foundation for this was the brief filed with the Board on behalf of respondents. The Examiner quotes from that brief in support of his finding. But there is nothing in the testimony which would warrant the Examiner ignoring respondents' second reason for not reemploying the six. The exceptions to the report do not specifically mention the exclusion of the second reason, but are broad enough to include this within their scope. The record squarely presents that problem for our consideration. We do not think it comes within the language of Section 10 (e) of the Act reading: "No objection * * * not * * * urged before the Board, its member, agent, or agency, shall be considered by the court * * *"[7] Even if it were judged to be

6. Since respondents had imposed two conditions on reemployment, namely, Association membership and dues check-off, which, because of the invalidity of the 1944 contract, were violations of the Act, they must make a proper offer of reinstatement.

7. See N.L.R.B. v. Cheney California Lumber Co., 327 U.S. 385, at pages 388 and 389, 66 S.Ct. 553, 90 L.Ed. 739; May Department Stores Co. v. N.L.R.B., 326

under that section, the exception to 10 (e) would apply. That exception reads: " * * * unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." The Spiewak reasons for denying reemployment to the six were developed on the Board's own cross-examination. The full significance of that testimony was apparently lost sight of by both sides in the dispute over whether the employer could rely on the 1944 contract for the refusal to take back the six. They failed to see the trees for the forest. The fact that respondents did not rehire the six because of employee opposition is vital to this branch of the litigation, and, in fairness to all concerned, cannot be disregarded.

The Board's order will be modified in accordance with this opinion and there will be a decree, substantially as follows, enforcing the order as modified:

The respondents shall:

1. Cease and desist from:

(a) Recognizing or dealing with Golden Fleece Association as the representative of any of their employees in respect to grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, unless and until that labor organization shall have been certified as such representative by the National Labor Relations Board;

(b) Giving effect to either the 1944 or 1945 contract with Golden Fleece Association, or to any extension, renewal, modification, or supplement thereof, or to any superseding contract with said organization which may now be in force;

(c) Discouraging membership in Amalgamated Clothing Workers of America, affiliated with the Congress of Industrial Organizations, or in any other labor organization of their employees, by discharging or refusing to reinstate any of their employees (with the exception of the six employees named hereafter in paragraph 2(b) ) or in any manner discriminating in regard to their hire or tenure of employment, or any term or condition of their employment;

(d) In any other manner interfering with, restraining, or coercing their employees in the exercise of the right to self-organization, to form labor organizations, to join or assist Amalgamated Clothing Workers of America, affiliated with the Congress of Industrial Organizations, or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act.

Take the following affirmative action:

(a) Withdraw and withhold all recognition from Golden Fleece Association, as the representative of any of their employees for the purpose of dealing with the respondents concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, unless and until that organization shall have been certified as such representative by the National Labor Relations Board;

(b) Offer to the employees listed in Appendix A annexed to the Board's Decision and Order (with the exception of the following six strikers rightfully excluded from reemployment, namely, Paul Arnone, Mildred Arzinger, Abe Lerner, Maria Pristera, Mary Tarantino and Nina Wegg) immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority or other rights and privileges, in the manner set forth in the section of the Intermediate Report entitled "The remedy";

(c) Reimburse each of their employees for dues checked off from his wages and paid on his account to Golden Fleece Association since April 1, 1944;

U.S. 376, footnote at page 386, 66 S.Ct. 203, 209, 90 L.Ed. 145; Marshall Field & Co. v. N.L.R.B., 318 U.S. 253, 255,

63 S.Ct. 585, 87 L.Ed. 744; N.L.R.B. v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39, at page 50.

(d) Post at their plant[8] copies of the notice attached hereto. Copies of said notice, to be furnished by the Regional Director for the Second Region, shall, after being duly signed by the respondents' representative, be posted by the respondents immediately upon receipt thereof and maintained by them for sixty (60) consecutive days thereafter in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the respondents to insure that said notices are not altered, defaced, or covered by any other material;

(e) Notify the Regional Director for the Second Region in writing, within ten (10) days from the date of the Decree, what steps the respondents have taken to comply herewith.

Judge O'Connell participated in the hearings and consideration of this case but died before it was decided.

### Notice To All Employees.

Pursuant to a Decree of the United States Court of Appeals enforcing a Decision and Order of the National Labor Relations Board, and in order to effectuate the policies of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., we hereby notify our employees that:

We Will Not in any manner interfere with, restrain, or coerce our employees in the exercise of their right to self-organization, to form labor organizations, to join or assist Amalgamated Clothing Workers of America, affiliated with the Congress of Industrial Organizations, or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

We Will Not recognize Golden Fleece Association as the representative of any of our employees for the purposes of collective bargaining until such time as it may be certified as their representative by the National Labor Relations Board.

We Will Not enforce any agreement heretofore or now existing with the Golden Fleece Association.

We Will reimburse all employees for the full amount of check-off dues paid by them to Golden Fleece Association since April 1, 1944.

All our employees are free to become or remain members of Amalgamated Clothing Workers of America, affiliated with the Congress of Industrial Organizations or any other labor organization. We will not discriminate in regard to hire or tenure of employment or any term or condition of employment against any employee because of membership in or activity on behalf of any such labor organization.

Proper signatures and date[9]

This notice must remain posted for 60 days from the date hereof, and must not be altered, defaced, or covered by any other material.

---

8. Proper location for the posting of said notice may be agreed upon between the parties subject to the approval of this Court.

9. Proper signatures to the above notice may be agreed upon between the parties subject to the approval of this Court.