**PAUL M. O'NEILL INTERNATIONAL DETECTIVE AGENCY, INC.,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 12992.

United States Court of Appeals Third Circuit.

Argued March 7, 1960.

Decided June 22, 1960.

C. P. Lambos, New York City (Lorenz, Finn & Giardino, New York City, Alfred Giardino, Joseph A. Byrne, New York City, on the brief), for petitioner.

Melvin J. Welles, Washington, D. C. (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before GOODRICH, STALEY and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

Petitioner, Paul M. O'Neill International Detective Agency, Inc., seeks to have set aside an order of the National Labor Relations Board entered July 20, 1959,[1] pursuant to Section 10(c) of the National Labor Relations Act, 29 U.S. C.A. § 151 et seq. Jurisdiction of the court exists under Section 10(e) and (f) of the Act.

Petitioner, a New Jersey corporation, conducts a detective agency in the course of which it furnishes guard service for 33 industrial plants located in the northern and central parts of New Jersey. Approximately 157 guards were employed at the time in suit. On November 23, 1956, the petitioner signed a collective bargaining agreement with the Independent Guards Union (hereafter IGU). Another organization called the

---

[1]. The Board's decision and order are reported at 124 NLRB No. 7.

New Jersey Guards Union (hereafter NJGU), unsuccessful in its attempt to unionize the petitioner's guard employees, filed a petition for a representation election on November 27, 1956, which was held on April 5, 1957.

The result of the election was:

Votes cast for NJGU ........ 17
Votes cast for IGU .......... 127
Votes cast against participating labor organizations ....... 7.

On April 12, 1957, NJGU filed objections to the conduct of the election and on May 14, 1957, it filed charges against the petitioner based on the same allegations upon which the objections to the election were founded. A complaint [2] was issued on December 31, 1957. It was consolidated with the objections to the election for the purpose of a hearing before a Trial Examiner pursuant to the direction of the Board.

The Trial Examiner ruled that the petitioner was guilty of unfair labor practices "in violation of Section 8(a) (2) and (3) of the Act, thereby interfering with, restraining and coercing the employees in the exercise of rights guaranteed by the Act in violation of Section 8(a) (1)." He recommended, among other things, that the election of April 5, 1957, should be set aside and a new election directed; and that petitioner should

2. In substance the complaint alleges, inter alia, as follows:

On November 23, 1956, Respondent and Independent Guards Union entered into a collective bargaining agreement, recognizing Independent Guards Union as the exclusive representative of its employees.

Said Independent Guards Union was not duly selected by a majority of the employees and does not represent an uncoerced majority of Respondent's employees.

Said agreement contains a union security provision requiring as a condition of employment that all employees eligible shall become members of the Union within thirty days after the execution of this agreement, or within thirty days after his hire, as the case may be. All employees who become members of the Union shall remain members of the Union during the term of this agreement, and providing further that the Respondent check off and deduct monthly from the pay of the employees union dues, and turn over moneys so deducted, to the Independent Guards Union.

The agreement was entered into, maintained, enforced and given effect to at times when Independent Guards Union had not received from the Board notice of compliance with Section 9, subsections (f), (g) and (h) of the Act and was not in compliance with Section 9, subsections (f), (g) and (h) of the Act.

The said agreement does not comply with the requirements of Section 8(a) (3) of the Act.

Respondent by its officers and supervisors, including Donald J. Leahey, State Supervisor, Bernard T. Sweeney, Personal Manager, Charles A. Boerensen, Captain of the Guards, Brendan McElaney, Captain of the Guards, has rendered unlawful assistance and support to Independent Guards Union by the following conduct:

(a) Distributing among its employees applications for membership in said Union;

(b) Soliciting and instructing its employees to sign membership applications for said Union;

(c) Instructing its officers and supervisors to distribute among its employees membership cards in said Union and to solicit its employees to sign membership cards in said Union;

(d) Permitting representatives of said Union to enter upon its plant and facilities to solicit for members and to campaign among its employees, although denying such access to other labor organizations;

(e) Collecting from its employees membership application cards for said Union;

(f) Informing its employees that it would recognize no other labor organization other than said Union as their collective bargaining representatives;

(g) Instructing its employees to authorize dues for said Union to be deducted from their pay;

(h) Executing, maintaining in effect, and enforcing the terms of a union security clause contained in the collective bargaining agreement referred to above;

(i) Deducting and checking off union dues for said Independent Guards Union from the pay of Respondent's employees;

(j) Establishing a company-wide seniority list on the basis of "seniority within the union" and enforcing said list with regard to layoffs, recalls and other terms and conditions of employment of Respondent's employees.

refund to all employees and former employees at the various plants in New Jersey, from whose wages it has deducted funds for transmittal to the IGU the amount of such deductions.[3]

Three members of the Board adopted the findings, conclusions and recommendations of the Trial Examiner.[4] Two members dissented.

Two questions are presented. First does the Board's determination that the petitioner assisted the Independent Guards Union in violation of Section 8 (a) (1) and (2) of the Act[5] find substantial support in the record as a whole, and second, did the petitioner violate Section 8(a) (3) of the Act[6] by executing a contract containing a union security clause with the IGU before the latter had complied with Section 9(f), (g) and (h) of the Act which require that the union file its constitution, by-laws and annual financial reports, and that the union's officers file non-Communist affidavits as a condition of recourse to the Board.

As to the first question, petitioner contends that the Trial Examiner should have believed the testimony of witnesses called by it and the IGU rather than those called by the General Counsel.

The petitioner stresses that the findings of the majority of the Board as to illegal assistance are unsupported by substantial evidence, and are clearly contrary to the preponderance of the credible evidence.

It leveled an attack upon the acceptance by the Trial Examiner and a majority of the Board of the testimony of Brendan B. McElaney, a captain of guards at the plant of Givaudan Corporation, who implicated both Donald J. Leahey, Director of Operations of petitioner, and Bernard T. Sweeney, Sales Manager and assistant to Paul M. O'Neill, petitioner's president, in the matter of assisting the Independent Guards Union in the distribution of its authorization cards. The petitioner asserts that his testimony was indefinite, vague and contradictory and that the

---

3. Petitioner deducts from the monthly pay of each guard the sum of fifty cents for transmittal to IGU.

4. The majority of the Board, however, did not adopt the Trial Examiner's finding that petitioner unlawfully dominated the IGU. The Board found that such finding was not warranted by the record. The majority, agreeing with the dissent, also declined to adopt a finding by the Trial Examiner that a guard named Summerfield was given an *IGU* authorization card to sign by his captain.

5. 29 U.S.C.A. § 158:
   "(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   "(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; *Provided,* That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay; * * * "

6. 29 U.S.C.A. § 158:
   "(a) It shall be an unfair labor practice for an employer—
   *   *   *   *   *
   "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159 (a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made and has at the time the agreement was made or within the preceding twelve months received from the Board a notice of compliance with section 159(f), (g), (h) of this title * * *."

Trial Examiner erred in regarding it as believable in the face of denials by Leahey and Sweeney. Attention was called to the fact that in his testimony McElaney did not remember whether occurrences involved Leahey or Sweeney; that McElaney answered "No" to a question under oath in two employment applications, inquiring whether he had ever been convicted of a crime, when in fact, he had more than twenty years prior thereto, pleaded guilty to petty larceny and had received a suspended sentence; that at the time of the hearing he was employed by a competitor of the petitioner which had a labor contract with the NJGU; and that a number of other circumstances were present which petitioner felt should have prompted the Trial Examiner to reject his testimony. Instead, petitioner contends that the Trial Examiner and the majority of the Board credited the testimony without so much as discussing any reasons therefor.

McElaney conceded that his memory was dim as to whether it was Sweeney or Leahey who placed the IGU authorization cards on his desk and asked him to get them signed. But he was positive that it was either one or the other of these supervisory heads of the petitioner. Both denied his statements. Even in the absence of a discussion by the Trial Examiner of his reasons for believing McElaney against the words of Sweeney and Leahey we must presume that he took into consideration their denials and McElaney's weakened memory, in making his determination as to whom to believe. McElaney's status, at the time he testified, as an employee of a rival of petitioner, under a labor contract with the NJGU and that he had twice misstated that he had never been convicted of crime in applications for employment when in fact he had pleaded guilty to a charge of petty larceny twenty years before, were not matters that necessarily destroyed his testimony. They were for the consideration of the Trial Examiner in determining along with all the other believable evidence the

weight to be given to McElaney's assertions.

Petitioner next charged that the acceptance of the evidence of a guard named Edward R. Howe, was an error. He was assigned to the plant of the Continental Paper Company. He testified that Sweeney accompanied by Clem Schramma, vice-president of the IGU, visited the Continental plant; that Sweeney introduced Schramma as a representative thereof and stated that

> "his [Schramma's] Union went before Mr. O'Neill and submitted a contract which calls for four holidays at double time, five days vacation for the first year, ten days vacation the third year and 15 days vacation the fifth year."

Howe testified that Sweeney said,
> "Mr. O'Neill figures the contract was suitable for the men and he agreed with them that he wouldn't recognize any other union."

Sweeney handed Howe, according to the latter's testimony, seven IGU cards and asked him to have the men at Continental Paper sign them, which Howe undertook to do. Sweeney, said Howe, told him that he might as well sign his own card which he did thereupon and handed it back to Sweeney. Petitioner argues that Howe's testimony was rendered unbelievable because he put the date of his meeting with Sweeney and Schramma, at which the foregoing is alleged to have occurred, at November 24, 1956, when his IGU card in his own handwriting is dated November 19, 1956, and the contract between petitioner and IGU was not signed until November 23, 1956. Petitioner says that Sweeney could not have told what the contract would contain on November 19, the date on which Howe signed his IGU card. Petitioner cited other circumstances and inconsistencies that it asserted showed that Howe's memory was faulty, and Sweeney and Schramma contradicted Howe's statements as to any activity by Sweeney in soliciting Howe to either sign his card or get other guards to sign.

Howe remained unshaken in his testimony with regard to his conversation with Sweeney concerning the distribution of the IGU cards and that he had signed one in Sweeney's presence and at his request, thereupon handing it to Sweeney. For all his confusion of dates and the contradictions of other witnesses it was still within the province of the Trial Examiner to believe or disbelieve him. Howe was still in the employ of the petitioner at the time of the hearing and the Trial Examiner, well within his right, for this reason chose to "place considerable credence upon his testimony with respect to resolving the salient issues in this proceeding."

John J. Doran, testifying on behalf of the General Counsel, stated in effect that he had been assigned by petitioner since November 1955 to the plant of the Continental Paper Company as a guard; that in November 1956 as he was leaving the gatehouse of the plant to commence his tour he saw Sweeney from a distance; that at the completion of the tour he returned to the gatehouse and asked Howe what Sweeney had been doing there; that Howe brought out a package of IGU cards stating that "O'Neill is starting a union"; that Sweeney had been there explaining the aims of the union and had left cards for the men to sign and said "There's one for you"; that he did not sign; that the following morning Captain Charles Boerensen in charge of guards at Continental told him that all the men were signing with the IGU and that there was a card for him to sign; that he still refused to sign; that from November 1956 to March 1957 Captain Boerensen made repeated requests to

him to sign an IGU authorization card to which he never acceded; that in February 1957 he was advised by Captain Boerensen that a complaint had been received that he had allowed unauthorized persons in the gatehouse; that this was followed by a notice from Leahey concerning unauthorized persons being permitted on the premises and that a repetition would result in dismissal of any guard involved; that he questioned Captain Boerensen as to who was meant by "unauthorized persons" and whether he meant the organizers of the NJGU; that Captain Boerensen replied "That's about the size of it."; but that when he asked in whose name he was to chase them—O'Neill's, Continental Paper's or Boerensen's—he, Boerensen gave a negative answer as to each; that he then told Boerensen he was not authorized to chase them in his own name and the matter was dropped there; that shortly thereafter he was ordered transferred to the Givaudan plant, refused to go and was discharged.[7]

Doran never signed an IGU authorization card and his separation from the service of the petitioner was apparently involuntary. His testimony was contradicted by Captain Boerensen. The Trial Examiner chose to believe Doran.

William Joseph Summerfield testified on behalf of the General Counsel in substance that he was employed by petitioner in November 1956 as a guard at the plant of Anheuser-Busch; that about a week after his employment a guard captain named Allegar came into the gatehouse of the plant as he, Summerfield, was finishing his midnight to seven o'clock shift and gave him and several other guards who were present cards

---

7. In reciting the circumstances of Doran's discharge the Trial Examiner mentioned that another guard named Foggen, also assigned to Continental Paper Company under Captain Boerensen did not sign with the IGU "and is no longer employed [by the petitioner]." Elsewhere in his report the Trial Examiner commented that the petitioner discouraged employee support of the NJGU "by disparate treatment of the two unions and those *employees who did not accord*

*warm support*" to the IGU. [Emphasis supplied.] The petitioner properly asserts that neither the discharge of Doran nor the severance of Foggen's services (the reason for which does not appear) support any inference of discrimination by it against employees who did not support the IGU. Indeed, the Regional Director on December 31, 1957 refused to issue a complaint charging that the petitioner committed an unfair labor practice when it discharged Doran.

and said "sign these." Summerfield tes- tified that one of guards wanted to know what it was for and Allegar said that it was for a union. Summerfield said that he signed the card and asked what the dues were to which Allegar replied, "Fifty cents a month, but you don't have to worry. O'Neill will pay for it." Summerfield did not read the card and did not know or ask any one what union he was joining. He left the job after three or four weeks. In making reference to Summerfield's testimony the Trial Examiner stated that he testified that Captain Allegar "handed him an IGU card and said 'sign this'". As mentioned in footnote 4 both the majority and the minority of the Board agreed that Summerfield did not testify that Allegar specified "an IGU card". They were correct.

Petitioner offered the testimony of Captain Boerensen, its present Assistant Director of Operations, but then Captain of the Guards at Continental Paper Company, Donald J. Leahey and Bernard T. Sweeney. Frank R. Fischer and Clem Schramma, president and vice-president respectively of the IGU, testified in its behalf. All generally contradicted the witnesses produced by the General Counsel as to assistance rendered by petitioner to the IGU organizational campaign. Petitioner contends that the conclusions reached by the Trial Examiner that their testimony was "vague", "evasive", "contradictory" or "improbable as well as incredible" were based on invalid reasons, susceptible of examination by the Board and the court. It is true as petitioner points out that some of the Trial Examiner's reasons for rejecting the testimony of given witnesses appear to be unsupported. For example, in the case of Captain Boerensen the Trial Examiner noted that he testified, among other things, that he was handed some IGU cards which he placed in a desk drawer in the gatehouse; that a few days later he gave the signed cards to Louis Hughes,[8] secretary-treasurer of the IGU when he came to call for them; that he had

no knowledge of how the guards came to sign them with but one exception, the guard on duty with him named Orland. He also testified that although officers of the IGU came to the gatehouse on various occasions to leave and pick up authorization cards he never saw them speak to any guards. The Trial Examiner then adds:

"It would seem for Union Officers not to speak to the employees they were attempting to organize is particularly significant in evaluating the conditions under which the guards joined and the circumstances under which IGU was established."

Petitioner submits that Captain Boerensen worked alone on the day shift except for one guard and therefore would not be in position to observe activities between the union officers and the guards which took place at night when Boerensen was not on duty. Therefore, petitioner asserts, the reasons for denying credibility to Boerensen failed.

Another instance cited by petitioner is the statement of the Trial Examiner in a footnote as follows:

"Leahey incredibly testified that even though he was in charge of all Respondent's personnel in New Jersey that none of the captains of the guards at the various plants had ever discussed with him whether any of the guards under their command performed their duties properly."

But the petitioner points to the answers to questions in which Leahey replied to the effect that the captains did "report" to him.

Further, petitioner points to the statement by the Trial Examiner that Sweeney could not remember the name of any employee who had a grievance when in fact it asserted he named three— Glen, Meyers and Chapter.

A number of other instances are cited by the petitioner with relation to the foregoing witnesses and to the IGU's witnesses Fischer and Schramma, whose

8. Hughes was Leahey's brother-in-law.

testimony the Trial Examiner likewise rejected. These inaccuracies on the part of the Trial Examiner, however, in our opinion, were not grave enough to show that his credibility findings, on balance, were so clearly erroneous as to warrant overturning them. ·

The petitioner charges that the Trial Examiner failed to look to the record for support of his findings and cites as an example the latter's finding that, "At those plants which did not have captains but chief guards the same instructions were given." Petitioner points out that the record does not contain such evidence. This inadvertence in the light of the multitude of considerations in the case does not appear to have had any important bearing upon the outcome and certainly cannot be said to characterize the entire analysis of the facts by the Trial Examiner.

A reconciliation of the contradictory testimony in this case posed a formidable task. Indeed, the majority of the Board in its decision conceded "that certain of the Trial Examiner's credibility resolutions are not free from doubt." But the carefully chosen discrepancies attributed to the Trial Examiner were not the only basis for his conclusions. Other considerations as well as the opportunity to observe the demeanor of the witnesses influenced his decisions to believe or disbelieve them.

■ The law in this circuit has been stated in N. L. R. B. v. Lewisburg Chair and Furniture Co., 3 Cir., 1956, 230 F.2d 155, 157,[9] wherein it was said:

"* * * Questions of credibility of witnesses have to be resolved in

litigation but in labor cases this court is not the place where such resolving takes place."

In this case substantial testimony was introduced by both the petitioner and the General Counsel. The determination became a question of credibility and, as in Lewisburg Chair, reached "the point where the trier of fact had to decide whether he believed the witnesses for one side or the other." The Trial Examiner, having heard and observed all the witnesses, decided against the petitioner. Whether we would have reached the same conclusion is of no moment, where, as here, the record contains substantial evidence in support of the Board's determination. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

Petitioner contends, however, that the Board erred in accepting the Trial Examiner's determination that the captains were supervisors within the meaning of Section 2(11) [10] of the Act and therefore had authority to bind the petitioner by their acts.

Here, too, the testimony was in direct conflict. Petitioner's former Captain McElaney testified that he recommended the hiring and firing of guards and that he suspended and assigned guards at the plant where he was stationed. The petitioner's witnesses, Captain Boerensen and Sweeney testified to the contrary. The Trial Examiner, affirmed by a majority of the Board, resolved this question against the petitioner. He said:

"The testimony reveals that the duties and responsibilities of the

9. See also N. L. R. B. v. Local 420, etc., 3 Cir., 1957, 239 F.2d 327, 328.

10. 29 U.S.C.A. § 152:
"When used in this subchapter—
* * * * *
"(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in

connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."
In this connection the following section is important:
"(13) In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S. C.A. § 152(13).

guard captains consisted of instructing new guards in their duties, submitting periodic written reports to Respondent's officials; acting as liaison between the plant officials and Respondent; maintaining time records of guards under their command; assigning overtime work to the guards; supervising safety and fire prevention measures; checking on appearances and sobriety of guards; ascertaining whether they are performing their duties satisfactorily; disciplining guards for infractions of their duties; recommending the hiring and discharge of guards; granting leaves of absence and scheduling shifts and weekly work schedules of the guards. In the event of an emergency the guards at the various plants are instructed to contact their respective captains. In addition, the captains wear distinctive uniforms, different than those worn by the guards under them; they receive a higher wage rate than the rank-and-file guards and they do not walk a tour of duty in making the rounds of the particular plant or premises. Equally significant is the fact that there is comparatively little supervision of guard captains by Respondent's officials because there are available only a few of Respondent's officials to superintend the considerable area in which are located the 33 plants serviced by Respondent in New Jersey."

What we have said heretofore concerning determinations of credibility has equal application here. It follows that the Board's acceptance of this determination by the Trial Examiner will not be disturbed.

Petitioner's last assertion on this issue is that the Board erred in finding the Trial Examiner's determination corroborated by the success of the IGU and by the provisions of the contract executed by the petitioner and that union. We do not agree.

Petitioner contends that the success of the IGU was the result of intensive and diligent work by IGU organizers as contrasted with the efforts of NJGU. It is asserted that the IGU began to organize in September 1956 with nine members and had obtained about 30 members by October 10, 1956; that the IGU president visited almost all of petitioner's 33 New Jersey plants between September and November 1956; that the IGU vice-president visited about 15 of petitioner's plants where he had worked and where he knew most of the guards; that the IGU held membership meetings in September and October 1956; and that in the final state of the organizational drive more than 30 guards were engaged in soliciting for the IGU in addition to the president and vice-president. In contrast, says the petitioner, the NJGU was represented by one organizer who visited at most six of petitioner's plants and who was simultaneously engaged in trying to organize another employer; that the NJGU did not distribute any literature or call any meetings; and finally that two of its officers had pleaded guilty to bribery of labor representatives.

The Board, however, determined that although the NJGU originally had only one active representative, who had been engaged in trying to organize the petitioner's guards since June 1956, three or four more organizers joined him in late October-early November 1956. The Board also found that the NJGU had obtained 64 signatures by November 1956 when it filed a petition for election, whereas the IGU, itself not formed until the fall of 1956, did not begin to solicit authorization cards until about November 11, although it managed to obtain over 130 signatures by November 21, ten days later, and further, executed a collective bargaining agreement with the petitioner on November 23.

The contract, which was for all practical purposes written by Leahey, contained both union security and dues check-off clauses. Working conditions were improved by the inclusion of four holidays to be compensated for at the rate of time and one half, and vacations graduated from one to three weeks

depending on length of service. Grievance machinery was also set up although testimony as to its use was at best vague.

The salary range for guards before and after the contract was identical, $1.00 to $1.25 per hour, depending upon the plant to which the guard was assigned. The IGU tried unsuccessfully to obtain a minimum of $1.15. Some guards did receive raises, however, because the rate of pay at a particular plant was upgraded. But such changes occurred after the contract had been executed and were *not* attributable to the efforts of the IGU.

These factors, the remarkable success of the IGU in obtaining authorization cards and recognition, and the contract, though challenged, may well be said to corroborate the Trial Examiner's conclusion that the petitioner assisted the IGU in its organizational drive. The Board was, accordingly, entitled to so find.

Petitioner objects to the Trial Examiner's finding of fact that it discriminated in admitting IGU representatives to gatehouses controlled by its guards while denying admission to NJGU organizers. John A. Morris was an NJGU organizer from June 1956 to January 1957, as well as its Secretary-Treasurer. At the time of trial he was employed by a competitor of petitioner. Although he was still a member of the NJGU he had no official capacity therein. Morris testified that in attempting to organize the petitioner's guards he and the NJGU president, John P. Morrison, visited the Anheuser-Busch and Lionel Train plants among others. He said that he would enter the gatehouse at the plant where he was visiting in order to speak to the guard who was stationed there. In this connection the following colloquy should be noted:

"Q. Did you go into the gate house? A. I believe I did enter a gate house, yes.

"Q. And would you talk to the guard in the gate house? A. Yes.

"Q. And would you ask him where the other guards might be found, working in the same plant? A. No, no. I inquired if there were other guards working on the job at that time whom I could talk to in the gate house, because I knew as a guard that you can't go traveling throughout a plant.

\* \* \* \* \*

"Q. \* \* \* Now with reference to speaking to the O'Neill guards, were you free to interview those guards at each of the places mentioned? A. Well, when I first started out there, as I said previously, I spoke to the guards either outside the premises or at the gate, or in the guard house, but later on, as an example, the Annheuser-Busch Brewery, the guards refused to speak with me and told me that they had received instructions that they were not to permit me on the property to talk to any guards about the Union.

\* \* \* \* \*

"Q. Did these guards tell you from whom they had received such instructions?"

\* \* \* \* \*

"A. In practically every instance, it was Mr. Sweeney."

McElaney testified that following a visit to the Givaudan plant by an NJGU representative, he was instructed by Leahey to "keep them out", and that he instructed his men not to permit the NJGU organizers on the premises. In fact, McElaney identified Morris as one of two organizers whom he had chased from the gatehouse of the Givaudan plant. In contrast McElaney testified that he allowed the IGU representatives to enter the gatehouse.

Doran, as noted elsewhere, testified that he was instructed by Captain Boerensen not to permit unauthorized persons in the gatehouse; and that when he asked Boerensen if the latter meant the NJGU organizers, he replied, "That's about the size of it."

Here again the Trial Examiner had a substantial basis on which to bottom his finding.

■ Petitioner complains that although its services were dispensed to 33 different plants during the period in question the evidence against it emanated from only two or three of those plants. If the evidence from any plant supports the finding and conclusion that petitioner has violated the Act as alleged in the complaint the relationship between the petitioner and the IGU is tainted regardless of what the circumstances of organization were at the plants other than the two or three concerning which evidence was offered.

■ On consideration of the record in this case as a whole, including the testimony opposed to the Board's view, we find that its decision that the petitioner violated Section 8(a) (1) and (2) of the Act is supported by substantial evidence.

We come to the second issue, that is, did the petitioner violate Section 8(a) (3) of the Act by executing a collective bargaining agreement containing a union security clause with the IGU, before the IGU had complied with Section 9(f), (g) and (h) of the Act.[11] That clause conditioned employment beyond 30 days upon membership in the IGU.

Petitioner first asserts that the Board erred in finding such a violation because a majority of its employees had designated the IGU their representative before it executed the agreement. But this fact does not negate the Board's finding where, as here, it has determined that the union was assisted by an action defined in Section 8(a) of the Act as an unfair labor practice, specifically Section 8(a) (1) and (2). Since we agree with the Board's determination that the petitioner violated those sections it is manifest that we must agree with its determination that petitioner also violated Section 8(a) (3).

Petitioner next asserts that the Board erred in this regard because the agreement contained a separability clause. It points to N. L. R. B. v. Rockaway News Supply Co., 1953, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 to support its argument. In that case the Board held that the entire agreement was illegal because of the inclusion of a single illegal provision, despite the presence of a separability clause. The Supreme Court reversed the Board, holding that the separability clause served to excise the illegal portion of the agreement. But that case clearly has no application here because, although the Board has ruled the entire petitioner-IGU agreement illegal, it has not done so because of the inclusion of the union security clause. It has held, and properly so, that the inclusion of that clause constituted a violation of Section 8(a) (3) in the circumstances of this case. Put another way, the violation occurred when the petitioner executed the agreement which contained the provision, the inclusion of which was in this instance proscribed. The separability clause cannot retroactively delete the union security clause which was present and proscribed at the time the contract was executed.

Petitioner's last argument in this regard is that because it did not enforce that clause until after the IGU had complied with Section 9(f), (g) and (h) of the Act, it did not violate Section 8(a) (3). That section as it then read permitted the inclusion of such a clause in an agreement between an employer and a labor organization [12] only, inter alia, where the latter

"* * * is the representative of the employees as provided in [Sec-

---

11. The dissenting members of the Board concurred with the majority that petitioner had so violated Section 8(a) (3) but did not agree with the finding of the majority that the execution of the agreement also constituted a violation of Section 8(a) (1) and (2) because they did no find that petitioner had illegally assisted the IGU.

12. The 1959 Amendment, Pub.L. 86–257, § 201(e) eliminated the requirement that the labor organization attain a certificate of compliance with Section 9(f), (g) and (h) before it could execute an agreement containing a union security clause.

tion 9] of the Act, in the appropriate collective-bargaining agreement when made and has at the time the agreement was made or within the preceding twelve months received from the Board a notice of compliance with [Section 9(f), (g) and (h) of this Act] * * *." 29 U.S.C.A. § 158(a) (3).

It is undisputed that at the time the agreement was signed the IGU had not received such a notice of compliance. Therefore, the agreement was illegal and the Board was correct in finding that the petitioner had violated Section 8(a) (3).

That the petitioner did not enforce the union security clause until after the IGU had complied with the foregoing provision is of no consequence, for the Act does not condition the finding of a violation on the enforcement of the clause.

Paragraph 2(c) of the Board's order requires the petitioner to

"Refund forthwith to all employees, and former employees, at [its] plants in New Jersey, and from whose wages it had withheld or deducted funds for transmittal to [IGU] the amount of all such deductions; * * *."

The validity of this type of provision was considered in Virginia Electric & Power Co. v. National Labor Relations Board, 1943, 319 U.S. 533, 63 S.Ct. 1214, 1220, 87 L.Ed. 1568. In sustaining "the power of the Board to order reimbursement in full under the circumstances [there] disclosed", the Court said, 319 U.S. at pages 540–541, 63 S.Ct. at pages 1218, 1219.

"The Board found that the Company was responsible for the creation of the I. O. E. by providing its initial impetus and direction and by contributing support during its critical formative period. It further found that the Company quickly agreed to give its creature closed-shop and check-off privileges 'in order to entrench the I. O. E. among its employees and to insure its finan-

cial stability.' The result was that the employees, under the I. O. E. by-laws, had to authorize wage deductions for dues to remain members of the I. O. E. and they had to remain members to retain their jobs. Thus, as a price of employment they were required by the Company to support an illegal organization which foreclosed their rights to freedom of organization and collective bargaining. To hold that the Board is without power here to order reimbursement of the amounts so exacted is to hold that an employer is free to fasten firmly upon his employees the cost of maintaining an organization by which he effectively defeats the free exercise of their rights to self-organization and collective bargaining. That this may pervert the purpose of the Act is clear. It is equally clear that the undoing of the effects of such practice may, in the judgment of the Board, remove a very real barrier to the effectuation of the policies of the Act, the protection of commerce through the elimination of industrial conflict, by guaranteeing full freedom of association and genuine collective bargaining to employees. An order such as this, which deprives an employer of advantages accruing from a particular method of subverting the Act, is a permissible method of effectuating the statutory policy."

In N. L. R. B. v. Spiewak, 3 Cir., 1950, 179 F.2d 695, 702, this court sitting en banc granted the Board enforcement of an order which required the employer to reimburse "each of [its] employees for dues checked off from his wages." Certain factual similarities exist between that case and this. In Spiewak and the instant matter the Board found that new employees would be required to join the union within four weeks and a 30 day period respectively. The contracts in both cases provided for dues check-off and maintenance of membership. More importantly, however, as will be seen later, the Board found in

both cases that the employers violated what is now Section 8(a) (1) of the Act by illegally assisting the union.

Recently the validity of this type of reimbursement order, now known as the Brown-Olds remedy,[13] has been considered by this court in the following four cases: N. L. R. B. v. American Dredging Company, 276 F.2d 286; N. L. R. B. v. U. S. Steel Corporation (American Bridge Division) and Local Union 542, 278 F.2d 896; Lakeland Bus Lines, Inc. v. N. L. R. B., 278 F.2d 888; and N. L. R. B. v. Local 1566, International Longshoremen's Ass'n, 278 F.2d 883.

In each of these cases the court found that the evidence failed to demonstrate that the application of the Brown-Olds remedy would in any way effectuate the policies of the Act, and accordingly refused to enforce it.

The immediate distinction between those four cases and this, is that in none of the foregoing was the union company-assisted, whereas in this case, as in Virginia Electric and Spiewak, supra, the Board found that the petitioner's employees were required, as a condition of continued employment, to join a union the organization of which had been illegally assisted by the petitioner in violation of Section 8(a) (1).

Applying the principles set forth in Virginia Electric Co. v. Board, supra, to this case, it appears that the petitioner provided the IGU with "its initial impetus and direction and [contributed] support during its critical formative period", as the Board found. It further appears, as the Board held, that the IGU achieved remarkable success in obtaining check-off privileges and a union security clause, or in the language of Virginia Electric that the petitioner

"quickly agreed to give its creature closed-shop and check-off privileges 'in order to entrench the [union] among its employees and to insure its financial stability.'"

Here, as in Virginia Electric, the employees were required by the petitioner, through its illegal assistance to the IGU

"to support an illegal organization which foreclosed their rights to freedom of organization and collective bargaining."

As the court held in N. L. R. B. v. U. S. Steel, supra, speaking of Virginia Electric [278 F.2d 899]:

"In such a situation reimbursement is proper because the union is an illegitimate union from the beginning. Its existence is illegal. The dues themselves are the fruits of the unfair labor practice, for, in the absence of the unlawful practice, there would have been no union; a fortiori, there would have been no dues paid to it."

In this same area Dixie Bedding Mfg. Co. v. N. L. R. B., 5 Cir., 1959, 268 F.2d 901, 903 has application. In that case the Board found that the petitioner had violated Section 8(a) (1) and (2) and required the petitioner, inter alia,

" * * * to reimburse its employees for any dues, assessments, or initiation fees deducted from their earnings and paid to Local 498."

In enforcing the Board's order the court said, 268 F.2d at page 907:

" * * * We think, however, the existence of the union security provision requiring the petitioner's employees to become members of the union within 30 days was in and of itself sufficient coercion to justify the issuance of the reimbursement order. * * * "

Similarly in applying the Brown-Olds Remedy in this case the Board was acting within its discretion and to effectuate the policies of the Act. Its imposition will have the salutary effect of restoring petitioner's employees to the

---

13. This remedy takes its name from United Association of Journeymen and Apprentices of Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO (J. S. Brown–E. F. Olds Plumbing & Heating Corporation), 115 NLRB 594.

position they would have occupied had not the petitioner violated the Act.

The petition to set aside the Board's order is denied.

The order of the Board will be enforced in its entirety.

A decree in accordance with this opinion and N. L. R. B. v. United States Steel Corp. (American Bridge Division), 3 Cir., 1960, 278 F.2d 896 may be submitted